DUTTON, ADM'X *v.* BRASHEARS FUNERAL HOME.

5-2713                                                     357 S. W. 2d 265

Opinion delivered May 21, 1962.

*Carlos B. Hill,* for appellant.

*W. Q. Hall,* for appellee.

JIM JOHNSON, Associate Justice.   This is an appeal from an order of the Washington County Probate Court allowing a claim for funeral expenses against the estate of Stonewall Jefferson Dutton, deceased.

For reversal appellant contends that the judgment was arbitrary and not supported by the evidence and that the claim should be disallowed because appellant was denied the right to take charge of the body and to arrange for the funeral and further that appellee contracted with volunteers who acted officiously and without interest.

The facts for the most part are undisputed.   Stonewall Jefferson Dutton died intestate in Washington County on the 7th day of December 1960.   At the time of his death Dutton had been separated from his wife for more than six months.   They had discussed her contemplated suit for separate maintenance against him and his

contemplated suit for divorce against her with an attorney in Fayetteville. The deceased had informed his wife and her attorney that he could not meet their demands for separate maintenance due to his inability to work because of the condition of his health. Thereupon the deceased was advised to go to a doctor and get a certificate verifying his contentions. Apparently upon the receipt of the certificate the matter of contemplated action was dropped, at least she testified as follows:

"Q. So far as you know you never got a decree of separate maintenance against him?

"A. No."

There is no contention or showing in this record that the deceased, even under the handicap of ill health, failed to adequately support his wife and two 14-year-old daughters. It is shown, however, that some three weeks prior to his death (which was the last time his wife saw him alive) deceased came by their home, which he and his wife owned, in Fayetteville and "brought the girls a coat apiece from Penney's." At the time of his death, Dutton was making his home with his parents at Goshen, a small town located on the main highway between Fayetteville and Huntsville. He died suddenly and unexpectedly from heart failure and the parents caused the body to be removed to the Brashears Funeral Home in Huntsville. Mrs. Dutton testified that neither of the deceased's parents nor close relatives called her but that a neighbor called and notified her of the death. She waited awhile for some of the family to call and when they didn't she called Brashears about 10 minutes after 9:00 the next morning and told him she would be up there about noon that day. She arrived at the funeral home about 1:30 in the afternoon and found that the deceased's mother, father and brother had already made the funeral arrangements. She stayed at the funeral home approximately 20 minutes and testified that she did not ask "Mr. Brashears if she could have custody of the body." She did inquire about the financial arrangements and when questioned by the court testified as follows:

"Q. Now, do I understand you to say that you raised with Mr. Brashears the question of who was going to pay for the funeral?

"A. I asked him what kind of financial arrangements had been made.

"Q. And his answer was that he knew the Duttons, they were reliable people, and he was not going to worry about getting his money, is that the essence of it?

"A. (Witness nods head affirmatively.) He told me to go on home and not worry about it. That I was not liable for it."

Mr. Brashears testified on direct examination relative to the financial arrangements as follows:

"Q. Did she ask you if she would be financially responsible for the arrangements?

"A. She did.

"Q. What did you tell her?

"A. I told her that she wouldn't be held liable personally, and that seemed to satisfy her.

"Q. And she never made any demand for the body? She never made any demand to make any sort of arrangements herself?

"A. No."

When questioned by the court, Mr. Brashears further testified as follows:

"Q. Mr. Brashears, were there arrangements, and an understanding about who was going to pay for this funeral?

"A. There wasn't any definite arrangement made about it at that time between the mother, father and brother. I asked them, naturally, about financial arrangements and they said, 'Well, he has a lot of property and some cattle and some things.' And said, 'Just don't

worry about your money.' And that was, approximately, the best I recall, what was said.

"Q. There was no writing, no contract or anything signed?

"A. No.

"Q. You didn't ask for a contract to be signed?

"A. No, not with that family."

As to the arrangements, Mrs. Dutton on cross-examination testified as follows:

"Q. Did you like the casket that the body was in?

"A. I don't recall noticing it at first, I don't recall that I saw anything wrong with it.

"Q. Did you like the clothes that the body had on? Did you notice them?

"A. Not particularly.

"Q. It did have—the body was laid out and in the casket ready for burial?

"A. Yes.

"Q. What sort of objection did you make?

"A. The body was drawn.

"Q. The body was what?

"A. The body was drawn. The hands were too far down.

"Q. Did you make any other objections?

"A. I don't recall."

When further examined by the court about the arrangements, Mrs. Dutton testified as follows:

"Q. Now, Mrs. Dutton, you mentioned something about you did not like the way your husband's body was laid out, something about the hands, you said something about that?

"A. Aunt Mona and I were talking and she may have even been the one that mentioned it, we were both talking about it, he was standing close by, but he said there was nothing they could do about it.

"Q. Were the hands folded across the body in some fashion or alongside of the body?

"A. Just down too far.

"Q. I'm not quite sure what you mean by saying they were down too far. What was the position of the hands? Were they folded across his body?

"A. No.

"Q. Were they down along his sides?

"A. No, they were just down this way some way.

"Q. They were on top of his body but they were not folded, is that correct?

"A. Yes.

"Q. And to you it looked as if they were farther down than they naturally would be, is that correct?

"A. Yes.

"Q. Did you mention that to Mr. Brashears?

"A. Aunt Mona did; we were talking about it.

"Q. Did you hear her mention it to him?

"A. Yes.

"Q. What reply if any did he make?

"A. He said that the body had been so long—he had been dead so long there was nothing they could do about it. And as I recall he said they brought the body in about noon.

"Q. As I understand it, Mr. Brashears suggested that the body had been dead so long when he took charge of the body that he could not manipulate the limbs?

"A. Yes.

"Q. And if I follow you on that. you do not propose this as an objection about the way Mr. Brashears handled it?

"A. No.

"Q. But it was simply a thing you observed?

"A. Yes.

"Q. Now, leaving that aside, Mrs. Dutton, and the fact you thought it looked unnatural, the hands were too far down, was there anything about the funeral service itself, including the casket and the flowers and the manner of conducting the funeral, and the actual burial, was there anything about the entire funeral service that you objected to, or found distasteful or inappropriate or off base?

"A. Well, I am objecting to them ignoring me and the children."

Fourteen days after the death of her husband, Mrs. Thelma A. Dutton was appointed administratrix of his estate, and within the time provided by law appellee Brashears Funeral Home filed its claim against the estate for the collection of the funeral expenses. It was stipulated between appellant and appellee that the amount of the claim was reasonable. Appellant, as administratrix, denied the claim on the basis of her contentions set out above, and as heretofore stated the trial court after hearing all of the evidence allowed the claim. As stipulated by the parties "the only issue here involved is whether, under the facts, the claim for the funeral expenses should be paid by the administratrix." Even though the Probate Court is a court of law, appeals from such courts are tried *de novo* in this court. *Campbell, Administrator* v. *Hammond,* 203 Ark. 130, 156 S. W. 2d 75; *Suits* v. *Chumley, Administrator,* 218 Ark. 488, 236 S. W. 2d 1001. On trial *de novo,* as sympathetic to the widow as the facts will permit us to be we cannot escape the conclusion that here the appellant is confusing the liability of the widow for funeral expenses with the

liability of the estate of the deceased for such expenses. Under the circumstances disclosed in the record before us we could not say that the widow, as such, would have been liable for the expenses here claimed, but such is not the case. In the early case of *Yarborough v. Ward,* 34 Ark. 204, this Court acknowledged that funeral expenses were an exception to the rule that ''no debts can be created against an estate after death.'' It is stipulated that the claim in the case at bar was filed within the time and in the manner required by law for the funeral expenses against the estate of the deceased. Ark. Stats. Ann. § 62-2606 provides that ''reasonable expenses'' shall be paid as a Class b claim and in *Security Bank & Trust Co.* v. *Costen,* 169 Ark. 173, 273 S. W. 705 this Court said: ''It goes without question that the estate of the decedent is chargeable for the reasonable and necessary expenses of interment of the body. The duty rests upon some of the living to see that the right of decent burial is provided, and from this duty springs a legal obligation of decedent's estate to pay the expenses.'' Appellant stipulated that the appellee's claim for burial was reasonable, and it would go without question that interment of the dead body was a necessary expense and in fact was a necessary undertaking.

From the evidence, it is clear that the appellant did not demand that she be allowed to take charge of the body, nor did she make any objections to the arrangements for interment as had been made nor did she make any objection at the time to the place of interment of the body.

The widow was not entitled to take charge of the body since she and her husband were not living together at the time of his decease. In *Teasley et al* v. *Thompson,* 204 Ark. 959, 165 S. W. 2d 940, this Court stated the following rule: ''Where the wife is not living with her husband at the time of his death or neglects or refuses to assume the trust incident to her right, a waiver of that right is implied and the right and duty immediately descends to the next of kin present and acting. In the case

of a dead body needing burial, the right of the spouse must be promptly asserted, or the right to possession of the body for the purposes of interment will be held to have been waived in favor of the next of kin.'' At page 963 of the same case it is said: ''(4) That, in case of husband and wife, the right of possession is in the surviving spouse, provided the husband and wife are living together at the time of the demise; (5) that the absence of the spouse, or his or her failure or refusal to act, has the effect of transferring the right of custody and duty of trusteeship to the next of kin in succession.'' Following this rule certainly it cannot be said that the mother, father and brother of this deceased were volunteers who were acting officiously and without interest.

We find, therefore, that appellant here waived any right she may have had to take charge of the body, when she did not make a prompt demand of the appellee to take charge of the body and she ratified the acts of the parents of the deceased when she did not make a timely objection when she visited the place of business of the appellee and viewed the body.

Affirmed.

WARD, ROBINSON, and BOHLINGER, JJ., dissent.

NEILL BOHLINGER, Associate Justice (Dissenting). I respectfully dissent from the majority decision in this case.

It is elementary and no man can gainsay that the funeral expenses are but one of the first charges against the estate of a deceased, but before that charge can come into being there are certain things that must be done, the most important of which is entering into a contract with the undertaker.

As I see it in this case, the sole question is who had the right to make that contract.

The evidence reflects that the appellant, the widow of the deceased, was living in their home in Fayetteville with two minor children. The deceased, her husband,

had been staying with his parents out in the country where he was engaged in the cattle business and it appears that it had been about three weeks since he had visited the appellant in Fayetteville. This man died very suddenly at his parents' home and the parents did not notify his wife, the appellant, of his death but she learned it from a neighbor.

The following day she phoned the undertaker, the appellee here, at Huntsville that she would be over that day to make the funeral arrangements. At that time no arrangements had been made by anybody. She made the trip from Fayetteville to Huntsville to make the funeral arrangements and the appellee advised her that the arrangements had been made by her husband's parents and there was nothing she could do. She inquired as to the financial arrangements that had been made for the funeral and was advised by the appellee that she would not have to pay them, that "the Duttons [parents of the deceased] are honest, reliable people. I'm not worried about the bill. They always pay their debts."

In 15 Am. Jur. § 9, p. 834, it is said:

"Right of Surviving Spouse.—It is generally conceded that on the death of a husband or a wife, the primary and paramount right to possession of the body and to control the burial or other legal disposition thereof is in the surviving spouse, and not in the next of kin, at least in the absence of a different provision by the deceased. The surviving spouse is entitled to select the place of burial and the place of reinterment if the remains are removed after burial. However, in making the selection, consideration must be given to the last expressed wish of the deceased. The right of a surviving spouse to control the burial is dependent on the peculiar circumstances of each case, and may be waived by consent or otherwise. However, if the parties were living in the normal relations of marriage, a very strong case will be required to justify a court in interfering with the wish of the survivor, and a widow's waiver of the right to admiister upon the estate of her deceased husband

.will not include a waiver of her right to control the interment of his body unless it is made to do so expressly.''

It therefore appears to me that the burial of a deceased mate involves something more than a legal duty. It involves a personal right and this right is closely linked in the hearts and minds of women as a final loving tribute at the close of a relationship.

It is a right, and I am unwilling to concede that that right is dependent on the fleetness of foot of the widow or the allacrity with which she reaches the door of the undertaker's shop. There is but one requirement and that is that she must move promptly. In this case the widow did and no arrangements had been made at the time she phoned the undertaker.

I am unwilling to concede that a relative, friend, or other person can inject himself in the transaction while the widow is trying to make her own arrangements and commit an estate [in this case a very meager one] to a funeral obligation which will be in accord with their sense of fitness. I must admit that the widow, the appellant here, might have used the entire $2,500.00 which is the appraised value of her husband's estate and have braved the world with her two small children penniless but there is nobody else who can force that condition upon her. And in this case it appears that almost a half of the appraised value of this estate was committed to this funeral by people who were not connected with nor dependent upon the estate in any way.

The case of *Security Bank and Trust Co.* v. *Costen,* 169 Ark. 173, 273 S. W. 705, was a case involving the incurring of expenses and advancement of money to pay funeral expenses. It is not applicable here. And the case of *Teasley* v. *Thompson,* 204 Ark. 959, 165 S. W. 2d 940, does apply and this phrase is used:

''It is generally conceded that on the death of a husband or wife, the primary and paramount right to possession of the body and to control the burial or other legal disposition thereof is in the surviving spouse, * * * ''.

In the *Teasley* case the court found that the widow had waived her rights. Such is not the case here.

What prompted the parents of the deceased to attempt to commit a disproportionate part of this meager estate to the burial of their son I do not know. But be that as it may, they were seeking to commit a fund which was not in their power to commit. It seems clear to me that even though the appellee knew that the widow was on her way to its place of business to make the funeral arrangements, nevertheless elected to contract with the parents of the deceased whose credit it regarded as good.

The parents of the deceased, in my opinion, were at best but officious volunteers who contracted a debt which they should now be made to assume.

I am strongly of the opinion that this case should be reversed and dismissed and for that reason I respectfully dissent from the majority view.

I am authorized to state that ROBINSON, J., joins in this dissent.